## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

RC Family Farms, Inc., David Bomgaars, and
Anita Bomgaars,

     Plaintiffs,

vs.

Compeer Financial, ACA, Compeer
Financial, PCA, and AgriBank, FCB,

     Defendants.

Court File No.  19-cv-2706

**COMPLAINT**

JURY TRIAL DEMANDED

---

Plaintiffs RC Family Farms, Inc., David Bomgaars, and Anita Bomgaars, for their Complaint against Defendants Compeer Financial, ACA, Compeer Financial, PCA and AgriBank, FCB, state and allege as follows:

### INTRODUCTION

1.     RC Family Farms is a family-owned pork producer in Iowa.  Compeer Financial, ACA and PCA are lending institutions.  RC Family Farms obtained a line of credit and cash management services from Compeer Financial.  Compeer Financial also arranged to invest RC Family Farm's cash in money market investment bonds held by AgriBank, FCB.  In 2018, RC Family Farms was targeted by thieves who induced the company's bookkeeper to send fraudulent wire transfers to foreign bank accounts.  Compeer Financial ordered AgriBank to send the wire transfers using RC Family Farm's investment  funds, rather than the line of credit (loan) proceeds. RC Family Farms had previously provided instructions and terms to Defendant Compeer Financial for transmitting wire transfers, and those instructions did not authorize its bookkeeper to order wire transfers from the investment funds.  Compeer Financial also ordered the wire transfers to be

sent without obtaining a second authorization from RC Family Farms, despite having promised previously to obtain dual authorizations for wire transfers.  Furthermore, Compeer Financial should have aborted the first wire transfer after it was unable to reach the bookkeeper at her phone number of record to confirm the transaction, as it had promised to do.  Instead, it contacted the President of RC Family Farms to ask him to update the bookkeeper's phone number on a form, failing to reveal that it wanted the new form to process a six-figure wire transfer to a foreign country, failing to make any mention at all of the six-figure transaction, and making no attempt to obtain the President's authorization for that transaction.  Compeer Financial knew that RC Family Farms had never previously sent a wire transfer to a foreign country.  Compeer Financial then repeatedly refused to accept the President's attempt to restrict the bookkeeper from making transactions, such as the ones at issue in this lawsuit, on the form that Compeer Financial had provided.  RC Family Farms and its principals bring this lawsuit to recover money they lost due to Defendants' breach of contract, conversion, and other wrongful actions.

## THE PARTIES

2.      Plaintiff RC Family Farms, Inc. ("RC Family Farms") is an Iowa corporation with its principal place of business at 1203 8th Street Southeast, Orange City, Iowa 51041.  RC Family Farms is a family-owned agricultural business that was founded by Plaintiff David Bomgaars.

3.      Plaintiff David Bomgaars is an individual who resides at 409 Central Avenue Southeast, Orange City, IA 51041.  He is the President of his family business, RC Family Farms, and the husband of Anita Bomgaars.

4.      Plaintiff Anita Bomgaars is an individual who also resides at 409 Central Avenue Southeast, Orange City, IA 51041.  She is Vice President and Secretary of RC Family Farms and the wife of Plaintiff David Bomgaars.

5.      Defendant Compeer Financial, ACA is an Agricultural Credit Association that operates from its address at 1921 Premier Drive in Mankato, Minnesota, 56001.   Compeer Financial, ACA also has significant operations in Lakeville, Minnesota and previously, Apple Valley, Minnesota. It has an office at 2600 Jenny Wren Trail, Sun Prairie, WI 53590.

6.      Defendant Compeer Financial, PCA is a Production Credit Association that operates from its address at 1921 Premier Drive in Mankato, Minnesota, 56001.   Compeer Financial, ACA also has significant operations in Lakeville, Minnesota and previously, Apple Valley, Minnesota.  It has an office at 2600 Jenny Wren Trail, Sun Prairie, WI 53590.  Compeer Financial, PCA is a subsidiary of Compeer Financial, ACA.

7.      On July 1, 2017, three agricultural credit associations and their subsidiaries merged into the organization now known as Compeer Financial, ACA.  Specifically, on July 1, 2017, Badgerland Financial, ACA of Wisconsin and its subsidiaries and 1st Farm Credit Services, ACA of Illinois and its subsidiaries merged into and with AgStar Financial Services, ACA of Mankato, Minnesota and its subsidiaries including AgStar Financial Services, PCA (collectively "AgStar Financial").  Following the merger, AgStar Financial Services, ACA, based in and operating from 1921 Premier Drive in Mankato, Minnesota, 56001, was the continuing association and was renamed Compeer Financial, ACA.

8.      Compeer Financial, ACA, Compeer Financial, PCA, and AgStar Financial Services, ACA and its subsidiaries, including AgStar Financial Services, PCA, are sometimes hereinafter collectively referred to as "Compeer Financial."  AgStar Financial Services, ACA and AgStar Financial Services, PCA are sometimes hereinafter collectively referred to as AgStar Financial Services n/k/a Compeer Financial.

9.     AgriBank, FCB ("AgriBank") is a Farm Credit Bank with its offices at 30 East 7th Street, St. Paul, Minnesota 55011.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332.   The amount in controversy, without interest and costs, exceeds the jurisdictional threshold of $75,000 under 28 U.S.C. § 1332.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events and omissions giving rise to the claim occurred in the District of Minnesota.   Among other things, RC Family Farms initiated its borrowing and financial relationship with then-AgStar Financial through employees based in Mankato and Apple Valley, Minnesota; RC Family Farms communicated with employees in Compeer Financial's Mankato and Apple Valley offices about the wire transfers described in this lawsuit; employees in Compeer Financial's Mankato, Minnesota and Apple Valley, Minnesota offices facilitated and enabled the wire transfers in this lawsuit and made representations and misrepresentations to Plaintiffs about their dual control procedures for wire transfers and other material aspects of their relationship; and most of the funds that were used for the wire transfers were held at AgriBank in St. Paul, Minnesota.

## FACTUAL ALLEGATIONS

### I.     RC Family Farms Becomes a Customer of Compeer Financial in 2016.

12.     RC Family Farms is a family-owned pork production business based in Orange City, Iowa with approximately 25 employees.   It was founded by David Bomgaars, who is married to Anita Bomgaars.   The Bomgaars are 64 years old.   They were high school sweethearts who grew up about 10 miles from Orange City.   David Bomgaars grew up on a farm and attended

Northwestern College in Orange City on a scholarship. He attended veterinary school at Iowa State University. He was a veterinarian for a number of years before he founded RC Family Farms. Anita Bomgaars was a substitute teacher in Orange City, Iowa for many years.

13.    RC Family Farms needed financing to fund its pork production operations and a financial institution to handle its cash management. As a result, in July 2016, RC Family Farms became a customer of AgStar Financial, n/k/a Compeer Financial. Through this relationship, RC Family Farms borrowed money from AgStar Financial to finance its pork production operations. As further discussed below, Compeer Financial also arranged to have RC Family Farm's excess cash placed in money market investment bonds with AgriBank.

14.    On July 27, 2016, RC Family Farms and AgStar Financial had a "closing" at which they executed documents regarding their new customer relationship. Among other things, RC Family Farms executed a Promissory Note/Loan Agreement dated July 27, 2016, in which Compeer Financial lent money to RC Family Farms through a revolving line of credit with a fixed commitment amount ("2016 Promissory Note"). The 2016 Promissory Note was signed by David Bomgaars as President of RC Family Farms. On July 27, 2016, David and Anita Bomgaars personally guaranteed repayment of any amounts borrowed under the 2016 Promissory Note.

15.    RC Family Farms instructed AgStar Financial n/k/a Compeer Financial that its President and Vice President were the only persons with the authority to enter agreements on behalf of RC Family Farms. No persons besides themselves were given authority to enter into agreements on the Bomgaars' individual behalf. RC Family Farms submitted to AgStar Financial n/k/a Compeer Financial a document entitled Certificate of Secretary dated July 15, 2016, signed by Anita Bomgaars that confirms this point. The Certificate identified the officers of RC Family Farms as David and Anita Bomgaars.

16.     RC Family Farms also submitted to Compeer Financial a Continuing Resolution to Borrow signed by David Bomgaars as President and Anita Bomgaars as Secretary dated July 15, 2016.  The Continuing Resolution stated that the President and Vice President of RC Family Farms were the only officials with authority to bind the company in the execution and delivery of loan applications, promissory notes, or other agreements. No other individual at RC Family Farms had such authority, nor did RC Family Farms advise Compeer Financial that any other person had such authority.

17.     Around the time of the closing, RC Family Farms advised AgStar Financial n/k/a Compeer Financial that it wanted the maximum level of dual controls to protect its accounts from fraudulent activity.  "Dual control" requires that two people at RC Family Farms authorize wire transfers or other transactions.

18.     On or about July 27, 2016, RC Family Farms submitted to AgStar Financial n/k/a Compeer Financial an Internet Banking Wire Transfer Service Setup Form and Security Disclosure signed by David Bomgaars as President.  The form served two purposes: (1) to enable RC Family Farm's use of online banking, and (2) to make security disclosures about, and allow RC Family Farms to request dual control for, wire transfers more generally. The instructions to the form are entitled, "Instructions for Completing Wire Transfer Setup Form."  The instructions do not state that dual controls are limited to internet banking transactions.  RC Family Farms checked the box on the form stating, "I want to secure my wire transfers with DUAL Control."  The language "I want to secure my wire transfers with DUAL Control" is not limited to wire transfers that are initiated online.

19.     Thereafter, AgStar Financial k/n/a Compeer Financial confirmed that RC Family Farms had dual control in place for wire transfers.  On July 28, 2016, Brenda Christenson, an

employee in AgStar Financial's Minnesota office sent an email to Megan Roos, General Counsel of RC Family Farms.  The email attached a form entitled, Internet Banking ACH Origination Service Setup Form and Security Procedure.  ACH refers to the Automated Clearing House, an electronic payment network used by financial institutions to process transactions.  In her email, Ms. Christenson instructed Ms. Roos to have the President of RC Family Farms sign "Half way down on the 1ˢᵗ page **if you would like to have dual authorizations just like with Wires**.  Also this box will need to be signed if you wish to have dual authorization."  (Emphasis added.)

20.     On July 28, 2016, Ms. Roos returned the signed form to Ms. Christenson in which David Bomgaars, as President of RC Family Farms, signed the box requesting dual authorizations for ACH transactions.  The language in the box states:  "I acknowledge and understand that having a second authorized person to verify each ACH Payment and/or ACH Receipt initiated is highly recommended by AgStar.  I understand the chances of error and fraud increase when only one person is authorized to initiate and approve ACH Payments and/or ACH Receipts."

21.     Ms. Roos accompanied the returned form with an email stating, "The signed ACH form is attached.  The form language regarding dual control wasn't all that clear to me.  **We do want dual control.  Please confirm that we filled it out correctly to get dual control**." (Emphasis added.)

22.     On July 29, 2016, Ms. Christenson replied to Ms. Roos with an email stating, "Yes the form looks good so you have dual authorization for ACH."  RC Family Farms elected dual controls on their account each time Compeer Financial gave them the opportunity to do so.

23.     The Internet Banking ACH Origination Service Setup Form and Security Procedure was accompanied by an Internet Banking ACH Origination Service Description.  Paragraph 13 of the Service Description states that AgStar Financial n/k/a Compeer Financial "establishes internal

risk parameters to identify out-of-pattern or suspect transactions and protect the Customer and Association from potential losses." As noted below, Compeer Financial never attempted to detect the "out-of-pattern or suspect transactions" described in this lawsuit.

24. Compeer Financial also arranged for RC Family Farms to enter into a Cash Management Program Enrollment Agreement and Disclosure ("Cash Management Agreement") with AgriBank and AgStar Financial k/n/a Compeer Financial on July 27, 2016. Under the Cash Management Agreement, RC Family Farms purchased money market investment bonds from AgriBank anytime it made payments to Compeer Financial in excess of RC Family Farm's indebtedness to Compeer Financial under the 2016 and 2017 Promissory Notes. In other words, RC Family Farms authorized AgriBank to apply any funds in excess of its indebtedness on its Compeer Financial loans to the purchase of money market investment bonds from AgriBank. RC Family Farms further authorized AgriBank to retire the investment bonds any time RC Family Farms owed outstanding principal on the Promissory Notes. RC Family Farms did not authorize AgriBank to make wire transfers using positive cash balances and its investment bonds, directly or through Compeer Financial, nor did it authorize Compeer Financial to permit its bookkeeper to wire funds from its positive cash investment balance.

25. On September 8, 2017, David and Anita Bomgaars executed a document entitled "Amendment to Notes" in which they became personally liable to pay any unpaid balance on the 2016 Promissory Note.

## II.     Plaintiffs Borrow Money from Compeer Financial in 2017.

26. On October 24, 2017, RC Family Farms entered into a new Promissory Note/Loan Agreement through which Compeer Financial provided RC Family Farms a renewed revolving line of credit with a fixed commitment amount (hereinafter the "2017 Promissory Note"). David

and Anita Bomgaars were co-borrowers on the 2017 Promissory Note.  The 2017 Promissory Note was signed by David Bomgaars as President of RC Family Farms and by David and Anita Bomgaars in their individual capacities.  RC Family Farms and the Bomgaars individually are jointly and severally responsible to repay the note as co-borrowers.

27.     On October 24, 2017, RC Family Farms and the Bomgaars executed an Affirmation of Intent that they intended to apply for joint credit from Compeer Financial.  The note identified David Bomgaars as the person who is authorized to receive legally-required disclosures under the note.

28.     On October 24, 2017, RC Family Farms and the Bomgaars entered into a Master Covenant Agreement with Compeer Financial, further establishing the terms of their borrowing relationship with Compeer.  The Master Covenant Agreement, which is signed by David Bomgaars as President of RC Family Farms and by David and Anita Bomgaars individually, placed various restrictions, controls, and limitations on the operations of RC Family Farms and their expenditures of funds.

29.     At or around the time of the execution of the 2017 Promissory Note, RC Family Farms submitted to AgStar Financial n/k/a Compeer Financial a Certificate of Secretary dated October 24, 2017, signed by Anita Bomgaars as Secretary, that again identified David and Anita Bomgaars as the officers of RC Family Farms.

30.     On October 24, 2017, RC Family Farms submitted to Compeer Financial a Continuing Resolution to Borrow, signed by Anita Bomgaars as Secretary of RC Family Farms, again stating that the President and Vice President of RC Family Farms were the only officials with authority to act for the company in the execution and delivery of loan applications, promissory notes, or other agreements.

9

31.     No other individual at RC Family Farms had such authority, nor did RC Family Farms advise Compeer Financial of any other person with such authority.  No individual other than the Bomgaars had authority to enter into agreements with Compeer Financial on behalf of the Bomgaars in their individual capacities.

**III.     Compeer Financial Facilitates Wire Transfers to Thieves in November 2018.**

32.     But for the attack by thieves on November 15, 2018, RC Family Farms had never made an international wire transfer through Compeer Financial.

**A.     November 15, 2018 Wire Transfer to Mexico.**

33.     At 10:03 a.m. on November 15, 2018, the bookkeeper for RC Family Farms received an email purporting to be from Chris Bomgaars, the Bomgaars' son.  Chris Bomgaars had previously been employed by RC Family Farms.  He had an accounts payable balance owed to him from RC Family Farms.

34.     The email was not actually from Chris Bomgaars, however.  Rather, it was from thieves who had hacked into RC Family Farm's computers and posed as Chris Bomgaars.  The email asked the bookkeeper to wire $875,000 to an account named "Turtle Odissey Comercial Sa De Cv" through a bank in Guadalajara, Mexico.

35.     To make their request appear legitimate, the thieves mimicked the language from an email that the real Chris Bomgaars sent the bookkeeper in 2017 instructing her to wire money to an outside account as payment toward his accounts payable balance with RC Family Farms.

36.     On July 27, 2016, RC Family Farms executed and provided to Compeer Financial a form entitled Third Party Designation Agreement and Authorization that gave the bookkeeper authority to make wire transfers for it.  The form was "from" RC Family Farms and signed by David Bomgaars as President.  The form applied to existing and future loans but did not provide

the bookkeeper with the authority to make wire transfers from RC Family Farms on positive balances that were held in investment bonds at AgriBank. The form did not give the bookkeeper authority to act on behalf of David and Anita Bomgaars in their individual capacities. The form listed a phone number for the bookkeeper at a veterinary clinic she worked for at the time that was owned by David Bomgaars.

**B.      Bookkeeper's November 15, 2018 Communications with Compeer Financial.**

37.     The bookkeeper attempted to use Compeer Financial's online portal to send the wire transfer to the thieves who were posing as Chris Bomgaars. Compeer Financial's online portal had a prominent button for customers to send domestic wire transfers but no prominent button for sending wire transfers to banks in other countries. Accordingly, on November 15, 2018 at 10:40 a.m., the bookkeeper emailed Compeer Financial stating: "I see in the business apps section of online banking only an option for domestic wire transfers. RC Family Farms needs to wire funds to a foreign account. Are you able to set that beneficiary up if I forward on the transfer instructions I received?"

38.     Seven minutes later, at 10:47 a.m., "Sammy" in Compeer Financial's Mankato, Minnesota office emailed a reply to the bookkeeper stating: "Yes send it over to us." Accordingly, at 10:51 a.m., the bookkeeper emailed the wire transfer instructions to Sammy. Sammy then followed up with an email to the bookkeeper at 10:55 a.m. asking, "What is the dollar amount for the wire?" At 11 a.m., the bookkeeper emailed back, "$875,000.00 Thank you". The bookkeeper believed that Compeer Financial was using internet banking and the ACH system to complete the wire transfer on her behalf. She sent all wire transfer instructions to Compeer Financial by email (not in person or over the phone).

**C.**     **Compeer Financial Should Have Stopped the Transaction When It Could Not Reach Bookkeeper.**

39.     At 11:54 a.m. on November 15, 2018, the bookkeeper emailed Compeer Financial and requested confirmation that the lender had initiated the processing of the wire transfer.  In the email, the bookkeeper asked, "Will authorization be necessary on our end once the wire has been processed?"

40.     On the afternoon of November 15, 2018, Compeer Financial prepared and emailed the bookkeeper a form to sign entitled, Compeer Financial Wire Funds Transfer Authorization. Paragraph 2 of the form stated that the authenticity of the wire transfer request would be verified and that Compeer Financial would ask the party submitting the request to provide the personal information provided at account opening or on record as identification, which it would verify. Paragraph 3 of the form stated that Compeer Financial would call the customer back and request verification of the authenticity of the request.  The form stated that: "Organization will call only the telephone number on record for Client.  If no response is received from the Client's designated telephone number, or if confirmation cannot be obtained in accordance with the Security Procedures, [Compeer Financial] will treat the Request as unauthorized and will not process the Request."

41. RC Family Farms did not give Defendants authority for the bookkeeper to make the wire transfers that are the subject of this lawsuit.  Among other things, the wire transfers were not from *loan* proceeds but from investment bonds held at AgriBank.

42.     At 2:55 p.m., Compeer Financial emailed the bookkeeper stating that it submitted the wire transfer and that "you will get an authorization callback to confirm everything once more." Later in the day, Compeer Financial attempted to call the bookkeeper at the veterinary clinic phone number that was listed on the July 27, 2016 authorization form described above.  Compeer

12

Financial could not reach the bookkeeper at that number, however, because David Bomgaars had since sold the veterinary clinic and the bookkeeper no longer worked there.

43.    At that point, Compeer Financial should have aborted the wire transfer consistent with its obligations, including its commitment in paragraph 3 of the wire transfer authorization form.  Instead, Compeer Financial called David Bomgaars around 4 p.m. on November 15, 2018 and asked him for the bookkeeper's phone number, which he provided.  Compeer Financial told David Bomgaars it wanted him to update the bookkeeper's phone number in writing and that it would email him a new form to sign to do so.

43.    As of that time, RC Family Farms had never sent a wire transfer to another country.

45.    RC Family Farms made 275 wire transfers through Compeer Financial from the time it became a customer through November 15, 2018, the date of the first fraudulent wire transfer request.  Of these, 264—or 96 percent—were to ADM Investor Services, a well-known agricultural commodities futures broker.  Of the remaining eleven (11), four (4) were to officers in RC Family Farms with the last name of "Bomgaars"; four (4) were to contract growers in amounts under $13,000; and three (3) were to well-known agricultural companies (one to a large feed supplier and two to a large pork producer).

46.    Compeer Financial did not tell David Bomgaars that the requested update of the bookkeeper's phone number was to send a wire transfer, let alone a nearly $1 million wire transfer, to Mexico—even though the company had never before sent an international wire transfer through Compeer Financial and had only previously sent a smattering of wire transfers to anyone other than the agricultural commodities futures broker ADM Investor Services.  Compeer Financial did not ask David Bomgaars to authorize the wire transfer.  Compeer Financial did not tell David Bomgaars that a new form was needed because the bookkeeper was attempting to send a wire

transfer.  Had Compeer Financial alerted Bomgaars to any of these facts, he would not have signed the document, and this and all future fraudulent wire transfers to the thieves would have been prevented.

**D.    Compeer Financial Deceptively Procures New Authorization Form.**

47.    At 4:22 p.m., Compeer Financial emailed David Bomgaars and his wife a partially-completed form to sign supposedly to update the bookkeeper's phone number.  David Bomgaars electronically signed this form using the DocuSign system and electronically submitted it around 4:25 p.m.  He checked a box to give the bookkeeper authority from RC Family Farms to make informational inquiries regarding Internet Banking accounts but no authority to make transactions.

48.    At 4:34 p.m., Compeer Financial voided this form, telling David Bomgaars that "Client needs to correct the information he is granting access for."  Two minutes later, it emailed David Bomgaars and his wife the same form to electronically sign, partially-filled out.  David Bomgaars again electronically signed this form using DocuSign and submitted it around 4:38 p.m. on November 15, 2018.  On this form, RC Family Farms gave the bookkeeper authority to make informational inquiries about Internet Banking on *loans* made under the 2017 Promissory Note but no authority to make transactions including wire transfers.  The form also did not give the bookkeeper authority to wire money from RC Family Farm's positive cash investment balance.

49.    At 4:40 p.m., Compeer Financial voided the second form, telling the Bomgaars that "client missed signing the right box."  At 4:44 p.m., it then emailed David Bomgaars and his wife the same form to electronically sign a third time, partially-filled out.  David Bomgaars and Anita Bomgaars electronically signed the form through DocuSign on behalf of RC Family Farms.  RC Family Farms gave the bookkeeper authority to make informational inquiries only about Internet Banking, and to make transactions only on *loans* made under the 2017 Promissory Note.  The form

was "from" RC Family Farms but not the Bomgaars in their individual capacities.  As was the case with the 2016 form, the form does not give the bookkeeper authority to wire money from any positive cash balance or the money market investment bonds held at AgriBank.

50.     David Bomgaars repeatedly attempted to restrict the authority of the bookkeeper on these forms, but Compeer Financial repeatedly rejected his attempts and sent new forms. Compeer Financial deceptively and inaccurately induced the Bomgaars to sign the authorization form by telling David Bomgaars that it was simply paperwork to update the bookkeeper's phone number on file with the lender.  At no time prior to 2018 had the Bomgaars in their individual capacities given the bookkeeper authority to make wire transfers or obtain information.  In other words, as of November 15, 2018, the bookkeeper had no authority to wire money from the loans under 2017 Promissory Note or any other loan because the co-borrowers—the Bomgaars—had not authorized her to do so.

**E.     By Giving the Bookkeeper Detailed Information About the Wire Transfers, Compeer Financial Acknowledged Its Understanding That the Wire Transfers Were "Internet Banking" Transactions.**

51.     The signed authorization form only gave Compeer Financial authority to disclose information to the bookkeeper about "Internet Banking" transactions involving one specific loan, namely the 2017 Promissory Note.  This contrasts with the authorization given to the bookkeeper in 2016, which authorized her to make informational inquiries about "all" banking matters on existing and future loans, not just those relating to "Internet Banking."

52.     Compeer Financial disclosed detailed information to the bookkeeper about the November 15, 2018 and subsequent fraudulent wire transfers to the thieves.  Compeer Financial was not authorized to do so because these wire transfers were made from RC Family Farm's positive cash balance (i.e. the money market investment bonds), not the loans.  Further, their

disclosure of this information is an acknowledgment by Compeer Financial of its understanding that the wire transfers were done through "Internet Banking."  Compeer Financial, by agreement, was only authorized to disclose information to the bookkeeper pertaining to "Internet Banking".

53.     As noted below, the thieves repeatedly asked the bookkeeper to provide detailed information about the wire transfers.  She was only able to do so because Compeer Financial provided that information to her.  The first and only time that Compeer Financial brought one of the thieves' wire transfers to the attention of someone at RC Family Farms other than the bookkeeper (e.g., when it for the first time sought a second authorization for a wire transfer to the thieves), the theft was detected immediately.

54.     At the prodding of the thieves posing as Chris Bomgaars, the bookkeeper asked Compeer Financial for confirmation on the status of the November 15, 2018 wire transfer.  At 11:03 a.m. on November 16, 2018, an employee of Compeer Financial's Apple Valley, Minnesota office emailed the bookkeeper information about the wire transfer, stating: "This is what I got from our finance team. Does this work?"  The information showed that Compeer Financial ordered the wire transfer, sent it from AgriBank to Wells Fargo in New York, which sent it to the bank in Guadalajara, Mexico.  A copy of the wire transfer confirmation is attached as Exhibit A.  Compeer Financial did not use loan proceeds for the wire transfer because RC Family Farms had a positive cash balance at the time of this wire transfer; rather, Compeer Financial funded the wire transfer with proceeds from RC Family Farms' investment bonds at AgriBank.

**F.      November 19, 2018 Attempted Wire Transfer to China.**

55.     The thieves, again posing as Chris Bomgaars, contacted the bookkeeper at 7:57 a.m. on November 19, 2018, this time requesting that $1.1 million be wired to "Sino Lanten Technology Co:, Limited" through a bank in China.

56.     At 8:16 a.m. on November 19, 2018 the bookkeeper emailed the wire transfer instructions provided to her by the thieves to Compeer Financial with the message: "$1,100,000.00 Thank you".  That day, Compeer Financial commenced initiation of the wire transfer.

57.     After the theft was exposed on November 26, 2018, the Federal Bureau of Investigation was able to assist in recovering this wire transfer before it was picked up on the receiving end.

**G.      November 21, 2018 Wire Transfers to Mexico.**

58.     At 8:46 a.m. on November 21, 2018, the thieves, posing as Chris Bomgaars, instructed the bookkeeper to send two wire transfers: (1) $590,800 to "W B S SYNTHECT SA DE CV" and (2) $821,000 to "Turtle Odissey Comercial Sa De Cv," through two different banks in Mexico.  That morning, the bookkeeper emailed the wire transfer instructions from the thieves to Compeer Financial with the message, "Thanks."

59.     Compeer Financial then completed and had the bookkeeper electronically sign a Wire Funds Transfer Authorization for the $590,800 wire transfer to W B S SYNTHECT SA DE CV.   As noted above, this "authorization" was not effective because Compeer Financial fraudulently induced David Bomgaars to sign the authorization form on November 15, 2018, and because RC Family Farms restricted the bookkeeper's authority on that form and the 2016 authorization form to *loan* transactions only.

60.     Compeer Financial did not have the bookkeeper sign any form authorizing the wire transfer in the amount of $821,000 to "Turtle Odissey Comercial Sa De Cv."  Indeed, it appears that the only writing Compeer Financial had for the $821,000 wire transfer to Mexico was the bookkeeper's email message of "Thanks."

61.     Compeer Financial provided the bookkeeper with information showing that it ordered the $590,800 and $821,000 wire transfers using funds from AgriBank, which sent the funds to Wells Fargo in New York, which sent them to two banks in Mexico, one in Guadalajara and one in Mexico City.   Attached as Exhibits B and C are copies of these wire transfer authorizations.   Compeer Financial did not use loan proceeds for the $821,000 wire transfer because RC Family Farms had a positive cash balance at Compeer Financial at the time of this wire transfer; rather, Compeer Financial funded the wire transfer with proceeds from RC Family Farms' investment bonds at AgriBank.   Furthermore, Compeer Financial only used loan proceeds for no more than about one-half (at most) of the $590,800 wire transfer, using proceeds from RC Family Farms' investment bonds at AgriBank for the remainder of the wire transfer.

62.     At 8:11 a.m., on November 26, 2018, the thieves, again posing as Chris Bomgaars, contacted the bookkeeper and instructed her to send three more wire transfers: two to banks in Hong Kong and one in the amount of $50,000 to a bank in Mississippi to a recipient named "Bruce E. Pierce."   The accountant forwarded the wire instructions for the two Hong Kong wire transfers to Compeer Financial at 9:12 a.m. on November 26, 2018 with the message, "Thank you."   These wire transfers were not sent, given that the theft was detected as discussed below.

**H.     First Time Dual Control Is Used, It Stops the Theft.**

63.     Upon receipt of the thieves' email, the bookkeeper gave Compeer Financial instructions for the delivery of the $50,000 wire transfer using the button for domestic wire transfers on Compeer Financial's online portal.   At 9:27 a.m. on November 26, 2018, Compeer Financial emailed Ms. Roos (the RC Family Farms General Counsel) asking her to provide dual authorization for the domestic wire transfer.   This email stated that the bookkeeper had "drafted a

CASE 0:19-cv-02706-PAM-KMM   Document 1   Filed 10/14/19   Page 19 of 37

Domestic Wire at Compeer Financial on 11/26/18 for 50000.00 to Bruce E. Pierce which requires first approval."

64.     Compeer Financial's request for dual authorization on the $50,000 wire transfer—the first time it requested dual authorizations on any of the fraudulent wire transfers—caused RC Family Farms to immediately detect the theft, freeze its accounts, stop the wire transfers that had not yet been sent, contact the FBI about the theft, and recoup the attempted $1.1 million wire transfer to the Chinese bank.

65.     Had Compeer Financial not executed the wire transfers (since it was using investment bonds and not loan proceeds for the transaction), or if it had required dual authorization for the wire transfers described above per the prior agreements with RC Family Farms—the above-described wire transfers would not have been completed.  RC Family Farms did not give the bookkeeper authority to materially alter the terms of their relationship with Defendants or to impose new material terms in their relationship.

## IV.     For Loan-Related Inquiries, the Bookkeeper's Authorization as of November 15, 2018 Was Limited to "Internet Banking" Inquiries.

66.     As noted above, the thieves repeatedly asked the bookkeeper to provide detailed information about the wire transfers, which the bookkeeper obtained from Compeer Financial. These include the following transactions, among others:

- At 9:27 a.m. on November 16, 2018, the thieves emailed the bookkeeper with the message: "I am waiting for your email with the wire confirmation [about the $875,000 wire transfer] once the transaction has occur."  The bookkeeper obtained the wire transfer confirmation number from Compeer Financial and emailed it to the thieves at 11:23 a.m.

- The thieves thereafter emailed the bookkeeper with the message: "Can you ask [Compeer Financial] if it is possible to send you the full wire confirmation page."  At 1:56 p.m. on

19

November 16, 2018, the thieves emailed the bookkeeper with the message: "Let me know if you were able to get the full confirmation page."  At 2:22 p.m., the bookkeeper emailed the thieves a detailed printout from the "finance team" at Compeer Financial.  Among other things, the printout includes the originating lender and account number, the sending bank and bank number for that bank, the receiving bank in the United States, the beneficiary bank and account number, and the time of and particulars of the transaction.

- At 9:35 a.m. on November 19, 2018, the thieves emailed the bookkeeper about the $1.1 million wire transfer with the message: "Send me the confirmation for this wire once you have it."  At 10:14 a.m., the bookkeeper emailed Compeer Financial with the message: "Would you be able to send me the confirmation for this?"  At 10:48 a.m., Compeer Financial again provided a detailed page of financial information regarding the wire transfer, which the bookkeeper emailed to the thieves.

- At 2:24 p.m. on November 21, 2018, the bookkeeper asked Compeer financial to "please send wire confirmation(s)" for the $821,000 and $590,000 wire transfers pursuant to the thieves' request.  At 4:10 p.m. on November 21, 2018 Compeer Financial again supplied detailed information on these wire transfers to the bookkeeper, which she emailed to the thieves at 4:21 p.m.

67.    As noted above, the authorization that Compeer Financial induced RC Family Farms to sign on November 15, 2018 only gave Compeer Financial authority to disclose information to the bookkeeper about "Internet Banking" transactions on the 2017 Promissory Note loans; no authorization was given for informational inquiries related to investment bond activity.  By disclosing detailed information to the bookkeeper about the wire transfers, Compeer Financial acknowledged its understanding that the transfers were facilitated through "Internet Banking."

68.     To the extent Compeer Financial now claims the above-described wire transfers were not "Internet Banking" transactions, then it lacked any express authority to share information with the bookkeeper about the transactions.

**V.     Compeer Financial Did Not Exercise Appropriate Due Diligence.**

69.     As noted above, Compeer Financial advised RC Family Farms that it employed internal risk parameters to identify out-of-pattern or suspect transactions to protect customers from financial losses.  Compeer Financial did not employ such standards so as to detect these wire transfers as being out-of-pattern and suspect, even though RC Family Farms had never previously sent an international wire transfer through Compeer Financial and even through 96 percent of its other wire transfers were to a large, well-known agricultural commodities futures broker.  Upon information and belief, Defendant AgriBank did not employ any security procedures of its own, let alone procedures that were effective to stop these unauthorized transactions.

70.     Compeer Financial also did not employ commercially reasonable security controls or controls that are standard and customary within the financial services industry or that effectively detected these out-of-pattern transactions, nor did AgriBank.  Had they done so, the wire transfers would have been stopped.  Compeer Financial knew that RC Family Farms had not made any prior international wire transfers and only 11 wire transfers to anyone other than ADM Investor Services, out of hundreds of wire transfers.  Moreover, Compeer Financial should have stopped the November 15, 2018 wire transfer when it could not reach the bookkeeper at her phone number of record, as it indicated by agreement that it would do.

71.     Compeer Financial did not follow the instructions of RC Family Farms, namely, to restrict the bookkeeper's authority to loan transactions, not investment bonds, and to have the

broadest possible dual controls for wire transfers, nor did Compeer Financial offer to RC Family Farms any type of dual controls other than the ones RC Family Farms selected, nor did AgriBank.

72. Compeer Financial also did not offer any security procedures for wire transfers to the Bomgaars in their personal capacities, nor did they disclose to David Bomgaars on November 15, 2018 that they were securing his signature because the bookkeeper was attempting to make an international wire transfer.  Defendant AgriBank sent the wire transfers based on the order of Compeer Financial without obtaining any authorization directly from Plaintiffs and appears to have done so without undertaking its own due diligence or security procedures to determine whether or not the transactions were authorized, even though RC Family Farms was its customer and it was holding at the time of the first wire transfer millions of dollars of RC Family Farms' investment funds.  Defendant AgriBank unreasonably and inappropriately relied on Compeer Financial for purposes of making these wire transfers, rather than utilizing its own security procedures and undertaking its own due diligence, even though RC Family Farms was its customer.

**VI.     Defendants' Actions Have Caused Harm to the Plaintiffs.**

73.     All told, Plaintiffs have lost the following sums due to the actions and omissions of Defendants, plus interest:

| Date of Transfer | Amount | Recipient | Location of Recipient Bank |
|---|---|---|---|
| 11/16/18 | $875,000 | Turtle Odissey Comercial Sa De Cv | Mexico |
| 11/21/18 | $821,000 | Turtle Odissey Comercial Sa De Cv | Mexico |
| 11/21/18 | $590,800 | W B S SYNTHECT SA DE CV | Mexico |
| **Total:** | **$2,286,800** | | |

74.     RC Family Farms and the Bomgaars immediately brought the above transactions to the attention of Compeer Financial and AgriBank and notified them that the transactions were not authorized and asked them to make financial recompense for their losses.  Defendants  refused to do so

## CAUSES OF ACTION

### COUNT ONE
### BREACH OF CONTRACT
### COMPEER FINANCIAL DEFENDANTS

75.     Plaintiffs restate and reallege the paragraphs above.

76.     For the reasons stated above, Compeer Financial contractually agreed that it would obtain dual authorizations, or authorizations from two people at RC Family Farms, prior to sending a wire transfer.

77.     Among other things, Compeer Financial agreed to this through RC Family Farm's execution of the form in which it stated, "I want to secure my wire transfers with DUAL Control."

78.     Compeer Financial also agreed to this through its emailed commitment that RC Family Farms would have dual authorizations on ACH transactions "just like with Wires."

79.     Defendant Compeer Financial breached its agreements to obtain dual authorization for wire transfers by sending wire transfers to the thieves without seeking dual authorization from two representatives of RC Family Farms.

80.     Defendant Compeer Financial also agreed to only allow the bookkeeper to make wire transfers on *loans*, but RC Family Farms had a positive account balance for the first two wire transfers and for at least about one-half (if not more) of the third wire transfer.  As a result, Compeer Financial made all or some of the wire transfers with investment bond funds, not by making a loan, breaching its contract with RC Family Farms.

81.     Defendant Compeer Financial also contractually agreed to verify the November 15, 2018 wire transfer sent to the thieves, to call the customer back at the number on record for RC Family Farms, and to treat the wire transfer request as unauthorized and not process it if no response was received at the number on file with Compeer Financial.

82.     When it was unable to reach the bookkeeper at the number on record, Defendant Compeer Financial was contractually obligated to treat the November 15, 2018 wire transfer as unauthorized and not process it.  Compeer Financial did not do this, in breach of its contractual commitment to Plaintiffs.  Instead, it called the President of RC Family Farms and deceptively induced him to sign a new form by misrepresenting that its purpose was simply to update the phone number on file for the bookkeeper.  Compeer Financial did not advise him that it was going to make a six-figure international wire transfer or seek his authorization for it.  Had Defendant Compeer Financial followed the agreed-upon commitment, the theft would have been stopped.

83.     Defendant Compeer Financial wrongfully induced the President of RC Family Farms to sign a new authorization form for the bookkeeper by falsely stating that its purpose was just to update her phone number.  On the new form, RC Family Farms only authorized Compeer Financial to provide information to the bookkeeper about "Internet Banking" and only for loans on the 2017 Promissory Note.

84.     Compeer Financial gave detailed information to the bookkeeper about the fraudulent wire transfers.  Defendant Compeer Financial was required to obtain dual authorizations for "Internet Banking" wire transfers.  Alternatively, to the extent Compeer Financial now claims the fraudulent wire transfers are not connected to "Internet Banking," then Defendant Compeer Financial is liable for breach of contact for supplying information to the bookkeeper without authorization.  Further, under the form that Compeer Financial induced RC Family Farms to sign

on November 15, 2018, Compeer Financial was only supposed to give information to the bookkeeper about "loan" transactions, not the company's positive cash balance.

85. Defendants also breached their agreement with Plaintiffs by wiring $821,000 to a bank in Mexico. At a minimum, Defendants were required to obtain a signed authorization for the transaction and failed to do so.

86. Paragraph 13 of the above-described Service Description states that Compeer Financial "establishes internal risk parameters to identify out-of-pattern or suspect transactions and protect the Customer and Association from potential losses." Defendants breached their agreement with Plaintiffs because they did not apply internal risk parameters, or did not successfully apply internal risk parameters, to identify the fraudulent wire transfers as out-of-pattern or suspect transactions.

87. The Third Party Designation Agreement and Authorization form dated November 15, 2018 is only "from" RC Family Farms, Inc. It is not from the Bomgaars in their individual capacity, even though they are co-borrowers on the 2017 Promissory Note and personally liable for its repayment. The Bomgaars never completed a form in their individual capacity authorizing the bookkeeper to wire money from the 2017 Promissory Note. To the extent that Compeer Financial claims that the wire transfers were funded with loan proceeds, Defendants breached their agreement with the Bomgaars individually by allowing the bookkeeper to make the wire transfers.

88. Defendant Compeer Financial's above-described breaches of contract caused damages to Plaintiffs.

## COUNT TWO
## BREACH OF CONTRACT
## AGRIBANK

89. Plaintiffs restate and reallege the above paragraphs.

90.     Under the Cash Management Agreement between RC Family Farms and AgriBank, RC Family Farms purchased money market investment bonds from AgriBank any time its cash funds at Compeer Financial exceeded its outstanding loan balance on the 2017 Promissory Note.

91.     RC Family Farms authorized AgriBank to apply its excess funds to the purchase of such bonds and to retire the bonds only when RC Family Farms owed outstanding principal on the 2017 Promissory Note.  RC Family Farms did not authorize AgriBank to wire money from the investment bonds, nor did it authorize AgriBank to use the investment bonds for any purpose other than repaying outstanding loans owed to Compeer Financial.  RC Family Farms also did not authorize Compeer Financial to accept orders from its bookkeeper to send wire transfers using proceeds of the investment bonds or positive cash balance.

92.     By accepting orders from Compeer Financial to wire funds using the proceeds of the investment bonds for purposes not authorized in its contract with RC Family Farms, Defendant AgriBank breached its contract with RC Family Farms, resulting in damages.

**COUNT THREE**
**PROMISSORY ESTOPPEL**
**COMPEER DEFENDANTS**

93.     Plaintiffs restate and reallege the paragraphs above.

94.     Defendants Compeer Financial made a clear and definite promise to obtain dual authorizations for wire transfers, as confirmed in the 2016 email of the Compeer Financial employee that RC Family Farms would have dual control for ACH transactions "just like with wires."

95.     Defendant Compeer Financial knew and intended that RC Family Farms would rely on this promise in establishing their accounts and security controls, and RC Family Farms did rely on the promise.

96.     Defendant Compeer Financial's promise to require dual control for wire transfers must be enforced in order to prevent the injustice of financial harm to Plaintiffs caused by Compeer Financial's failure to adhere to its promise.

**COUNT FOUR**
**CONVERSION**
**ALL DEFENDANTS**

97.     Plaintiffs restate and reallege the above paragraphs.

98.     Plaintiff RC Family Farms entered into a Cash Management Agreement and relationship with AgriBank and Compeer Financial under which RC Family Farm's funds in excess of the outstanding principal indebtedness on its 2017 Promissory Note would be invested in money market investment bonds held by Defendant AgriBank.

99.     Plaintiff RC Family Farms held a property interest in the money market  investment bonds and in any amounts held by Defendants in excess of the outstanding principal indebtedness on its 2017 Promissory Note.

100.    Defendants, individually and collectively, deprived RC Family Farms of this property interest by ordering and sending wire transfers using these funds.  The November 15, 2018 document that Compeer Financial induced RC Family Farms to sign only authorized the bookkeeper to make wire transfers from the proceeds of "loans," not from positive cash balances held in investment bonds.  All of the proceeds of the $875,000 wire transfer and the $821,000 wire transfer, and at least one-half of the proceeds of the $590,800 wire transfer, came from RC Family Farms' own funds held or managed by Defendants, not "loans."   As a result, Defendants wrongfully converted RC Family Farms property.

101.    Defendants, individually and jointly, are liable to Plaintiff RC Family Farms for the conversion of its property

27

**COUNT FIVE**
**FRAUDULENT INDUCEMENT/MISREPRESENTATION**
**COMPEER DEFENDANTS**

102.    Plaintiffs restate and reallege the paragraphs above.

103.    Defendant Compeer Financial called David Bomgaars and told him that he needed to sign a form to update the bookkeeper's phone number on file with the company.  Defendant Compeer Financial did not tell Mr. Bomgaars that the bookkeeper was attempting to make an $875,000 wire transfer to Mexico—the first international wire transfer ever made by RC Family Farms to a foreign bank while a customer of Defendants.  It did not attempt to obtain authorization from him for the wire transfer on the phone call.

104.    Instead, it simply told him it would send a form to update her phone number.  When he checked the boxes on the partially-completed form from RC Family Farms, Mr. Bomgaars twice declined to check the box giving the bookkeeper authority to make wire transfers, but Defendant Compeer Financial kept rejecting the form until the company returned the form with the box checked.

105.    Compeer Financial materially misrepresented the purpose of the form to RC Family Farms, knowing that its representation about the purpose of the form was false and doing so with the intent to persuade RC Family Farms to return the signed form.  RC Family Farms relied on the statements made by Compeer Financial in returning the form and would not have signed the form had it known the true intentions of Defendant Compeer Financial, which was to make a large wire transfer to a foreign country.

106.    Moreover, prior to the execution of the new form on November 15, 2018, the 2016 form on file to authorize the bookkeeper to make wire transfers was signed only by David Bomgaars as President of RC Family Farms and not on behalf of the Bomgaars individually.  To

the extent Defendants claim that the 2018 authorization is from the Bomgaars in their personal capacities (it is not because it is specifically marked as being "from" RC Family Farms), then Defendants fraudulently induced their signatures for the reasons stated above.

107.    Compeer Financial fraudulently induced RC Family Farms to sign the November 15, 2018 form.  To the extent Compeer Financial claims that the November 15, 2018 form gave it authorization to make the wire transfers at issue in this lawsuit, Compeer Financial is barred from doing so due to its own wrongful acts.

108.    Defendant Compeer Financial's above-described fraudulent inducement and misrepresentation caused harm to the Plaintiffs as the proximate result of the false representation of material fact by Defendant Compeer Financial.

**COUNT SIX**
**NEGLIGENT MISREPRESENTATION**
**COMPEER DEFENDANTS**

109.    Plaintiffs restate and reallege the paragraphs above.

110.    Defendant Compeer Financial falsely told RC Family Farms that it needed to sign the above-described wire transfer form to update the bookkeeper's phone number on record with Defendants.  By so doing, it influenced and induced RC Family Farms to sign the form.  RC Family Farms reasonably and with justification relied on the information provided by Defendants in signing the form.

111.    As a financial institution and in light of the above-plead facts, Defendant Compeer Financial owed RC Family Farms a duty to use reasonable care and competence in communicating with RC Family Farms, but it failed to do so.

112.    Defendant Compeer Financial failed to use reasonable care in communicating the purpose of the form to Plaintiffs, and supplied false information to Plaintiffs about the purpose of

the form, and they justifiably relied on the information provided by Compeer Financial. If Defendant Compeer Financial had accurately described the purpose of the form, or told RC Family Farms that it was requesting the new form be signed because the bookkeeper was trying to make an $875,000 wire transfer to a Mexican bank, it would not have signed the form. Plaintiffs justifiably relied on the false information provided by Compeer Financial.

113. Defendant Compeer Financial also twice rejected the attempt of RC Family Farms to return a sign form that did *not* allow the bookkeeper to make transactions on the 2017 Promissory Note, but Compeer Financial refused to accept a limited form.

114. The above-described conduct constitutes a negligent misrepresentation of material facts surrounding the purpose of the form in violation of a duty owed by Defendant Compeer Financial to Plaintiffs.

115. RC Family Farms was damaged by its reliance on the false and deceptive information provided by Defendant Compeer Financial, which proximately caused the damage to Plaintiffs. Furthermore, to the extent that Defendant Compeer Financial now claims that the November 15, 2018 form gave it authority to make the wire transfers at issue in this lawsuit, it is barred from doing so due to its own wrongful acts.

## COUNT SEVEN
## BREACH OF IMPLIED COVENANT
## OF GOOD FAITH AND FAIR DEALING
## COMPEER DEFENDANTS

116. Plaintiffs restate and reallege the paragraphs above.

117. Plaintiffs' banking agreements and relationships with Defendant Compeer Financial contain implied covenant of good faith and fair dealing. Through the implied covenants, Defendant Compeer Financial was obligated to act in good faith and deal fairly with Plaintiffs in

performing the terms of the agreements and not to hinder the Plaintiffs' performance or their exercise of their rights under the contracts.

118.     Through the above-described conduct, Defendant Compeer Financial violated the implied covenant of good faith and fair dealing.  Among other things, based on the actions of Defendant Compeer Financial, RC Family Farms reasonably believed that Compeer Financial would obtain two authorizations from the company before sending wire transfers from its accounts, which it had promised to do.  To the extent Defendant Compeer Financial now claims that it subsequently had authorization to send the wire transfers to the thieves based solely on the authorization of the bookkeeper, it breached the covenant of good faith and fair dealing owed to Plaintiffs to apply dual controls for wire transfers.

119.     In addition, Defendant Compeer Financial breached its covenant of good faith and fair dealing owed to Plaintiffs through the above-described circumstances through which it induced David Bomgaars to sign a wire transfer authorization form on November 15, 2018. Defendant Compeer Financial was unable to reach bookkeeper the at the phone number on file with the institution.  Rather than refusing to make the wire transfer, Compeer Financial deceptively induced the Bomgaars to sign a new Third Party Designation Agreement and Authorization by falsely telling David Bomgaars that the purpose of the form was simply to update the bookkeeper's telephone number on record with the company.  Plaintiffs twice attempted to return the form without granting the bookkeeper authority to make wire transfers, but Defendant Compeer Financial refused to accept the form.  Defendant Compeer Financial violated the covenant of good faith and fair dealing by surreptitiously inducing the signing of the form, unreasonably and unfairly hindering RC Family Farms from exercising its desired rights under the banking relationship, and

31

creating a false sense of security when Compeer Financial in fact was putting the interests of Plaintiffs at risk, which was not disclosed to Plaintiffs.

120.    Defendants Compeer Financial also violated the covenant of good faith and fair dealing by giving an order to AgriBank to wire funds from the surplus money that RC Family Farms held at AgriBank when Plaintiffs had not given the bookkeeper any authority to make wire transfers from the money market investment bonds and when the document Compeer Financial ostensibly relied on to make the wire transfers was restricted only to the proceeds of loans.  To the extent that Compeer Financial argues that the funds for the wire transfers came from loan proceeds, prior to November 15, 2018 (and afterward), David and Anita Bomgaars in their individual capacities had not given the bookkeeper authority to wire funds from the 2017 Promissory Note.

121.    Based on the totality of the circumstances in this Complaint, Defendant Compeer Financial violated the covenants of good faith and fair dealing, causing damage to Plaintiffs.

**COUNT EIGHT**
**BREACH OF IMPLIED COVENANT**
**OF GOOD FAITH AND FAIR DEALING**
**AGRIBANK**

122.    Plaintiffs restate and reallege the above paragraphs.

123.    Plaintiffs' banking agreements and relationships with Defendant AgriBank contain implied covenants of good faith and fair dealing.  Through the implied covenants, Defendant AgriBank was obligated to act in good faith and deal fairly with Plaintiffs in performing the terms of the agreements and not to hinder the Plaintiffs' rights or performance under the contracts.

124.    Through the above-described conduct, Defendant AgriBank violated the implied covenants of good faith and fair dealing.  Among other things, AgriBank accepted and executed orders from Compeer Financial to wire proceeds from the money market investment bonds belonging to RC Family Farms and held at AgriBank to Wells Fargo and ultimately to recipients

in foreign countries.  AgriBank did this without any authorization given to it by Plaintiffs, without any valid authorization given to Compeer Financial, and when the only time the Cash Management Agreement allowed AgriBank to retire the bonds was when RC Family Farms owed money to Compeer Financial on the 2017 Promissory Note.

125.    Based on the totality of circumstances in this Complaint, Defendant AgriBank violated the covenants of good faith and fair dealing, causing damage to Plaintiffs.

**COUNT NINE**
**UNIFORM COMMERCIAL CODE**
**ALL DEFENDANTS**

126.    Plaintiffs restate and reallege the above paragraphs.

127.    Every state has enacted Article 4A of the Uniform Commercial Code ("UCC") relating to fund transfers.

128.    In Minnesota, Article 4A is found at Chapter 336.4A of the Minnesota Statutes.  In Wisconsin, it is found at Section 410 of the Wisconsin Statutes.

129.    UCC Article 4A-202 is entitled "Authorized and verified payment orders."  In Minnesota, it is found at Minn. Stat. § 336.4A-202, which provides in pertinent part as follows:

> (a) A payment order received by the receiving bank is the authorized order of the person identified as sender if that person authorized the order or is otherwise bound by it under the law of agency.

> (b) If a bank and its customer have agreed that the authenticity of payment orders issued to the bank in the name of the customer as sender will be verified pursuant to a security procedure, a payment order received by the receiving bank is effective as the order of the customer, whether or not authorized, if (i) the security procedure is a commercially reasonable method of providing security against unauthorized payment orders, and (ii) the bank proves that it accepted the payment order in good faith and in compliance with the security procedure and any written agreement or instruction of the customer restricting acceptance of payment orders issued in the name of the customer. The bank is not required to follow an instruction that violates a written agreement with the customer or notice of which is not received at a time and in a manner affording the bank a reasonable opportunity to act on it before the payment order is accepted.

(c) Commercial reasonableness of a security procedure is a question of law to be determined by considering the wishes of the customer expressed to the bank, the circumstances of the customer known to the bank, including the size, type, and frequency of payment orders normally issued by the customer to the bank, alternative security procedures offered to the customer, and security procedures in general use by customers and receiving banks similarly situated. A security procedure is deemed to be commercially reasonable if (i) the security procedure was chosen by the customer after the bank offered, and the customer refused, a security procedure that was commercially reasonable for that customer, and (ii) the customer expressly agreed in writing to be bound by any payment order, whether or not authorized, issued in its name and accepted by the bank in compliance with the security procedure chosen by the customer.

(d) The term "sender" in this article includes the customer in whose name a payment order is issued if the order is the authorized order of the customer under subsection (a), or it is effective as the order of the customer under subsection (b).

130.    In Wisconsin, UCC Article 4A-202 is found at Wisc. Stat. § 410.202 and contains similar language.

131.    To the extent the UCC applies to all or some Defendants[1] or circumstances, Defendants did not comply with UCC Article 4A-202 in arranging, facilitating, receiving, and sending the wire transfers at issue in this lawsuit.  The wire transfers were not authorized orders of Plaintiffs, nor are Plaintiffs otherwise bound by the bookkeeper's actions.  As noted above, in the November 15, 2018 form that Compeer Financial induced RC Family Farms to sign, Plaintiff restricted the bookkeeper's authority to wire transfers on *loans* (and specifically, the 2017 Promissory Note).  RC Family Farms did not give the bookkeeper authority to wire proceeds from the money market investment bonds or cash funds of RC Family Farms held at AgriBank.  In addition, Compeer Financial promised to require dual authorization for wire transfers, which it failed to do for the wire transfers at issue in this lawsuit. As a result, the wire transfers were not

---

[1] Minn. Stat. § 336.4A-105 defines a "bank" as a "person engaged in the business of banking and includes a savings bank, savings association, credit union, and trust company."  The Compeer Defendants gave the orders for the wire transfers at issue in this lawsuit but AgriBank sent the wire transfers.

authorized, and Defendants are liable for them, with interest.  Moreover, Defendant AgriBank sent the wire transfers based on the orders of Compeer Financial without obtaining any authorization directly from Plaintiffs and appears to have done so without undertaking its own due diligence as to whether or not the transactions were authorized, even though RC Family Farms was its customer and it was holding at the time of the first wire transfer millions of dollars of RC Family Farms' investment funds.

132.   To the extent that Article 4A-202(2) applies, it was breached in that Defendants failed to comply with its provisions in improperly arranging, facilitating, receiving, and sending the wire transfers.  Compeer Financial agreed with RC Family Farms that it would verify the authenticity of wire transfers through certain security procedures, which must be commercially reasonable.  Defendants did not follow the promised security procedures before making the wire transfers or follow the written instructions of and agreements with RC Family Farms.  Defendants did not require dual authorization for the wire transfers.  Defendant Compeer Financial did not terminate the November 15, 2018 wire transfer when it was unable to reach the bookkeeper at the phone number on file with it. Additionally, Defendants did not follow the instructions of RC Family Farms to limit any authority of the bookkeeper to loans, not investments.

133.   To the extent that Article 4A-202(2) applies, it was breached for the additional reason that Defendants did not use security procedures that are commercially reasonable methods of providing security against unauthorized payment orders.  Defendants did not honor the wishes of Plaintiffs in wanting to secure their accounts with the broadest possible dual authorizations, including for wire transfers.  Defendants did not honor the agreement with RC Family Farms to "establish internal risk parameters to identify out-of-pattern or suspect transactions and protect the Customer and Association from potential losses."   Defendants did not apply internal risk

parameters, or did not successfully apply internal risk parameters, to identify the fraudulent wire transfers as out-of-pattern or suspect transactions. Defendants further did not use commercially reasonable security procedures based on the circumstances of RC Family Farms as known to Defendants, including the type of wire transfers normally issued by RC Family Farms. RC Family Farms had never wired money to a foreign country, and all but eleven of its past wire transfers were to the same entity (a well-known agriculture futures broker). Defendants also did not use security procedures of similarly-situated institutions.

134. Article 4A-202(2) was breached by Defendant AgriBank for the additional reason that RC Family Farms was a customer of AgriBank but AgriBank upon information and belief did not apply any of its own security procedures to "red flag" these wire transfers. To the extent that Defendant AgriBank claims to have relied on Compeer Financial to obtain authorization and/or supply security procedures, its reliance was misplaced, unreasonable, and ineffective based on the totality of circumstances described in this complaint.

135. UCC Article 4A-204 is entitled "Refund of payment and duty of customer to report with respect to unauthorized payment order." In Minnesota, it is found at Minn. Stat. § 336.4A.204, which provides in pertinent part as follows:

> If a receiving bank accepts a payment order issued in the name of its customer as sender which is (i) not authorized and not effective as the order of the customer under section 336.4A-202, or (ii) not enforceable, in whole or in part, against the customer under section 336.4A-203, the bank shall refund any payment of the payment order received from the customer to the extent the bank is not entitled to enforce payment and shall pay interest on the refundable amount calculated from the date the bank received payment to the date of the refund. However, the customer is not entitled to interest from the bank on the amount to be refunded if the customer fails to exercise ordinary care to determine that the order was not authorized by the customer and to notify the bank of the relevant facts within a reasonable time not exceeding 90 days after the date the customer received notification from the bank that the order was accepted or that the customer's account was debited with respect to the order. The bank is not entitled to any recovery from

the customer on account of a failure by the customer to give notification as stated in this section.

136.    In Wisconsin, UCC Article 4A-204 is found at Wisc. Stat. § 410.204 and contains similar language.

137.    To the extent that Article 4A applies, Defendants are liable to Plaintiffs under Article 4A of the UCC to refund the full amounts of the unauthorized wire transfers at issue in this lawsuit, with interest, based on all the facts and circumstances set forth in this complaint.

## JURY DEMAND

138.    Plaintiffs hereby requests a trial by jury on all claims so triable.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs demand judgment as follows:

1.    Monetary judgment against Defendants in an amount to be proven at trial in excess of $75,000.

2.    An award of Plaintiffs' costs and expenses incurred in bringing this action.

3.    Such other and further legal and equitable relief as may be deemed appropriate.


Dated: October 14, 2019                          By: /s/Jerry Blackwell                          
                                                        Jerry W. Blackwell, MN #186867
                                                        Gerardo Alcazar, MN #0386522
                                                        BLACKWELL BURKE P.A.
                                                        431 South Seventh Street
                                                        Suite 2500
                                                        Minneapolis, MN 55415
                                                        Ph: (612) 343.3200
                                                        Fax: (612) 343.3205
                                                        Email: blackwell@blackwellburke.com
                                                                galcazar@blackwellburke.com

                                                        ATTORNEYS FOR PLAINTIFFS