UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| RC Family Farms, Inc., David Bomgaars, and Anita Bomgaars, | Civ. No. 19-2706 (PAM/KMM) |
| Plaintiffs, | |
| v. | **AMENDED**[1] **MEMORANDUM AND ORDER** |
| Compeer Financial, ACA, Compeer Financial, PCA, and AgriBank, FCB, | |
| Defendants. | |

This matter is before the Court on Defendants' Motion to Dismiss. For the following reasons, the Motion is granted in part and denied in part.

**BACKGROUND**

Plaintiffs David and Anita Bomgaars own Plaintiff RC Family Farms, a large-scale hog farming operation in Orange City, Iowa. (Compl. (Docket No. 1) ¶ 1.) To help with cashflow, RC maintained a $20 million line of credit with Defendant Compeer Financial, ACA, formerly known as AgStar Financial Services, ACA, of Mankato. Because an Agricultural Credit Association such as Compeer cannot hold assets, Compeer used Defendant AgriBank, FCB, for this purpose. So, if RC paid Compeer more than it owed on the line of credit, Compeer would transfer the balance to AgriBank to purchase money-market investment bonds. Similarly, if the line-of-credit balance was negative, AgriBank would transfer funds from RC's investment accounts to cover that balance.

---

[1] The Court's previous Order stated that the Motion was denied. However, as the written opinion makes clear, the Motion is granted in part and denied in part.

As part of the account-opening agreements, the Bomgaars signed an "Internet Banking Wire Transfer Service Setup Form and Security Disclosure." On this form, the Bomgaars indicated that they wanted "dual control" (i.e., dual authorization) for wire transfers. (Schwartz Decl. Ex. G.) Defendants assert that this form applied only to wire transfers accomplished through internet banking, and only applied to transfers accomplished through an automated clearinghouse (ACH). It is not clear how Plaintiffs would know whether a particular wire could be accomplished through an ACH.

On November 15, 2018, hackers sent an email to RC's bookkeeper, Renae Bahrke. This email purported to be from the Bomgaars's son, Chris, and asked Renae to transfer $875,000 that RC owed Chris to an account in Mexico. (Id. ¶ 33.) Ms. Bahrke was fooled by the email and tried to initiate the wire transfer through Compeer's online portal. Because the portal only provided for domestic transfers, Bahrke emailed Compeer, asking whether Compeer could wire money internationally if she provided the beneficiary and transfer instructions. (Id. ¶ 37.) Compeer replied via email, telling Bahrke to send the information to Compeer. (Id. ¶ 38.) Compeer then emailed Bahrke a wire funds transfer authorization form, which provided that Compeer would verify the identity of the party submitting the wire transfer request using information provided at the opening of the account. (Id. ¶ 40.)

However, when Compeer called Bahrke's phone number provided when the account was opened, it could not reach her because she no longer worked at that number. (Id. ¶ 42.) Plaintiffs allege that Compeer's procedures required Compeer to abort the wire transfer at that point. (Id. ¶ 40.) Instead, Compeer called David Bomgaars, asking him to provide an

2

updated number for Bahrke. (Id. ¶ 43.) Compeer did not tell Bomgaars why it was requesting a new phone number for Bahrke and did not mention the pending international wire transfer. Bomgaars provided Bahrke's new phone number, and Compeer told Bomgaars that it would send him a form so he could update the number formally with Compeer.

Compeer emailed the form to Bomgaars, which he filled out. Included on the form was a box to be checked if the individual was to be given authority to make transactions. Bomgaars did not check this box. After it received the form from Bomgaars, Compeer rejected it and sent a new form, telling Bomgaars that he needed to "correct the information [you are] granting access for." (Id. ¶ 48.) This time, Bomgaars checked a box giving Bahrke authority to make inquiries about loans, but again no authority to make transactions. Again, Compeer voided the form, telling Bomgaars that he had "missed signing the right box." It emailed a form for the third time, and this time, Bomgaars gave Bahrke authority to make transactions on the loans RC had with Compeer. Compeer then completed the wire transfer, using funds from RC's investment bond account at AgriBank. (Id. ¶ 54.)

On November 19, 2018, Bahrke received another email purporting to be from Chris Bomgaars, asking for another transfer, this time of $1.1 million to a bank in China. (Id. ¶ 55.) Bahrke emailed the transfer instructions to Compeer, and Compeer transferred the money. (Id. ¶ 56.) The FBI was ultimately successful in recovering the funds before the transfer cleared the Chinese bank. (Id. ¶ 57.)

On November 21, 2018, Bahrke received yet another mail from the thieves posing as Chris Bomgaars, asking her to wire $590,000 to one bank in Mexico and $821,000 to

3

another bank in Mexico. (Id. ¶ 58.) Bahrke again emailed the wire transfer instructions to Compeer. Compeer sent both wire transfers, using proceeds from the investment account for the larger transfer and approximately half of the smaller transfer, and loan proceeds for the remainder. (Id. ¶ 61.)

On November 26, 2018, Bahrke received another email, asking her to wire $50,000 to a bank in Mississippi and two additional transfers to banks in Hong Kong. (Id. ¶ 62.) Compeer contacted RC's general counsel, asking her to provide dual authorization for the domestic wire transfer. (Id. ¶ 63.) This request led RC to discover the thefts and freeze its accounts. (Id. ¶ 64.) The Hong Kong transfers were not sent.

Before these November 2018 wire transfers, RC had never asked Compeer for an international wire transfer. (Id. ¶ 32.) Indeed, nearly all of the 275 wire transfers Compeer made for RC before the November 2018 transfers were to a single agricultural commodities broker. Only 11 were to other entities or individuals, many to individuals named "Bomgaars" or were in small amounts to contract growers. (Id. ¶ 45.)

Plaintiffs brought this lawsuit after Compeer and AgriBank refunded only $500,000 of the $2.2 million the thieves stole. Their claims are breach of contract against all Defendants, promissory estoppel against Compeer, conversion against all Defendants, fraudulent inducement against Compeer, negligent misrepresentation against Compeer, breach of the covenant of good faith and fair dealing against all Defendants, and a claim for violation of Minnesota's and Wisconsin's UCC against all Defendants.

4

## DISCUSSION

To survive a motion to dismiss under Rule 12(b)(6), a complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also Fed. R. Civ. P. 12(b)(6). A claim bears facial plausibility when it allows the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. When evaluating a motion to dismiss under Rule 12(b)(6), the Court must accept plausible factual allegations as true. Gomez v. Wells Fargo Bank, N.A., 676 F.3d 655, 660 (8th Cir. 2012). But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to support a claim. Iqbal, 556 U.S. at 678.

### A. Breach of Contract

There are two agreements at issue. The first is called the Compeer Financial Wire Funds Transfer Agreement. (Schwartz Aff. Ex. D.) This agreement provides that Compeer will "request verification of the [wire transfer] request by using the Security Procedures" outlined in the agreement. (Id. ¶ 3.) Those security procedures are that Compeer "will request the party submitting the [wire transfer] Request to provide the personal information provided at account opening and/or on record as identification and will verify the same against the information provided." (Id. ¶ 2.) Then, Compeer will call "only the telephone number on record" for the person requesting the wire. (Id. ¶ 3.) "If no response is received from the [requester's] designated telephone number, or if confirmation cannot be obtained

5

in accordance with the Security Procedures, [Compeer] will treat the Request as unauthorized and will not process the Request." (Id.)

The second agreement governing wire transfers is called an "Internet Banking Wire Transfer Service Setup Form and Security Disclosure." (Schwartz Aff. Ex. G.) This form describes optional "Security Procedures," including "Dual Control." (Id. ¶ 16.02.) Dual Control "require[es] that activities initiated by one user must be approved or verified by a second [authorized] user before they will take effect." (Id.) Because Dual Control is recommended but not required, the Bomgaars had to opt in to it, and they did so by checking the "Election of Dual Control" box on page 5 of this form. The election states, "I want to secure my wire transfers with DUAL Control." (Id. at 5 § 3.)

Defendants argue that Compeer complied with the wire transfer agreement by verifying Bahrke's identity. They also argue that the wire transfer form requiring dual authorization does not apply to the transfers at issue here, because those transfers were not made through internet banking and did not use the ACH system. In essence, Defendants contend that the form requiring dual authorization applied only to domestic wire transfers, because Compeer's internet banking portal supports only domestic wire transfers.

Minnesota construes ambiguous contracts against the drafter. Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc., 913 N.W.2d 687, 693 (Minn. 2018). Whether a contract is ambiguous is a question of law for the Court to determine. Id. at 692. And at this preliminary stage, it is ambiguous which of the agreements, if any, applied here. The language of the dual control election could lead a reasonable person to believe that

Compeer would apply dual control to all wire transfers, whether through the internet portal or otherwise.

Moreover, Plaintiffs have sufficiently alleged that Compeer did not comply with the first agreement: when Compeer was unable to reach Bahrke, according to the security procedures in that agreement, that should have been the end of it. Instead, Compeer went outside its security procedures and contacted David Bomgaars, without informing him of the pending very large wire transfer to a foreign bank. A reasonable jury could conclude that Compeer violated the first agreement.

Defendants also argue that any contract claims against AgriBank should be dismissed because Plaintiffs cannot establish any damages as to AgriBank. Because the parties' agreements allowed Compeer to draw down Plaintiffs' investment-account balance as soon as the line-of-credit balance was negative, Defendants contend that there could be no damage from Compeer taking the wire-transfer funds directly from the AgriBank investment funds.

But at this preliminary stage, Plaintiffs have plausibly alleged that AgriBank was not entitled to send RC's money anywhere but to Compeer. Although there are perhaps only minimal damages from this discrete breach, the ultimate consequences of AgriBank's alleged breaches are extensive. The Motion to dismiss Plaintiffs' breach-of-contract claims is denied.

B.   **Promissory Estoppel**

In 2016, a representative of Compeer emailed RC's general counsel the internet banking form described above. In the email, Compeer's employee told the attorney to have

7

David Bomgaars sign "Halfway down on the 1st page if you would like to have dual authorizations just like with Wires." (Compl. ¶ 19.) According to Plaintiffs, this supports their allegation that the dual control election applied to all wire transfers.

Compeer first argues that this claim fails because Plaintiffs cannot and do not allege that Compeer intended Plaintiffs to rely on this statement with respect to non-internet/ACH wire transfers. But it is plausible that RC believed that dual authorization would apply to all wire transfers and relied on that reasonable belief to give Bahrke the authorization to send wire transfers. Compeer argues that RC has not pled that it changed its position as a result of the alleged promise, but this is precisely what Plaintiffs allege. RC would not have given Bahrke the authorization to send wire transfers if it knew that those wire transfers were not subject to dual authorization. The Motion on this point is denied.

**C.     Conversion**

This claim asserts that RC had a property interest in the investment-account funds at AgriBank, that the agreements only allowed AgriBank to send those funds to Compeer, and that AgriBank's direct provision of the funds to the wire-transfer banks constituted a conversion.

Conversion requires an act "done without lawful justification." DLH, Inc. v. Russ, 566 N.W.2d 60, 71 (Minn. 1997) (quotation omitted). Thus, a conversion claim that merely duplicates a breach-of-contract claim is subject to dismissal. As Defendants argue, "Minnesota law does not recognize an independent tort for conduct that merely constitutes a breach of contract." First Integrity Bank, N.A. v. Ohio Cas. Ins. Co., No. 05cv2761, 2006 WL 1371674, at * 6 (D. Minn. May 15, 2006) (Davis, J.). Plaintiffs' conversion allegations

are the same as their breach-of-contract allegations, and Plaintiffs cannot allege damages separate from the damages they claim for breach of the parties' contracts. See Hanks v. Hubbard Broad., Inc., 493 N.W.2d 302, 308 (Minn. Ct. App. 1992) (To recover for breach of contract and tort, "plaintiff must prove separate damages for [the tort] and for breach.") The conversion claim is dismissed.

**D.     Breach of Covenant of Good Faith and Fair Dealing**

Plaintiffs' claim that Defendants violated the covenant of good faith and fair dealing repeats the same allegations as their breach-of-contract claims, namely the failure to employ dual authorization for wire transfers, Compeer's solicitation of Bahrke's phone number without telling David Bomgaars why it was requesting the number, and AgriBank's provision of the funds directly from RC's investment accounts. Defendants contend that, because Plaintiffs' breach claims fail on these points, its covenant claims fail as well. The Court has determined that Plaintiffs' breach-of-contract claims are plausibly pled, however, and the Motion on this claim is denied.

**E.     Fraudulent Inducement and Misrepresentation/Negligent Misrepresentation**

Plaintiffs allege that Compeer made a fraudulent or negligent misrepresentation when its employee called David Bomgaars and represented that he needed to update Bahrke's phone number. According to Plaintiffs, the actual purpose of the form the employee sent to David Bomgaars was to accomplish the wire transfer, and the employee either fraudulently or negligently misrepresented that fact by failing to disclose the pending wire transfer. Defendants argue that this claim should be dismissed because a duty to

9

disclose arises only in the context of a fiduciary relationship, and there was no such relationship between Compeer and Plaintiffs.

But a fiduciary relationship is not a necessary prerequisite to a claim for a misrepresentation in a business relationship, as the case Defendants cite makes clear. Rather, a misrepresentation claim will also lie if "one [party] has special knowledge of material facts to which the other party does not have access" and when a party who speaks does not "say enough to prevent his words from misleading the other party." Richfield Bank & Trust Co. v. Sjogren, 244 N.W.2d 648, 650 (Minn. 1976) (quotation omitted). Plaintiffs have alleged both of these situations, and the Motion on these claims is denied.

**F.   UCC**

The parties seem to agree that the provisions of the UCC do not apply to the transactions at issue. This claim is therefore dismissed.

**CONCLUSION**

Plaintiffs have plausibly pled their claims. Accordingly, **IT IS HEREBY ORDERED that** Defendants' Motion to Dismiss (Docket No. 16) is **GRANTED in part** and **DENIED in part**.

Dated:   February 4, 2020

                                                 *s/Paul A. Magnuson*
                                                 Paul A. Magnuson
                                                 United States District Court Judge